Dana M. Johnson
WILDERNESS WATCH
P.O. Box 9765
Moscow, Idaho 83843
(208) 310-7003 | Phone
danajohnson@wildernesswatch.org

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435
tim@bechtoldlaw.net

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| WILDERNESS WATCH; ALLIANCE FOR THE WILD ROCKIES; FRIENDS OF THE WILD SWAN; and FLATHEAD-LOLO-BITTERROOT CITIZEN TASK FORCE, and CONSERVATION CONGRESS,<br><br>Plaintiffs,<br><br>v.<br><br>LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, and US FOREST SERVICE,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This case challenges the June 2, 2021 decision by the U.S. Forest
Service to authorize intensive helicopter intrusions into the Scapegoat Wilderness
to poison 67 miles of stream and 3 lakes in the North Fork of the Blackfoot River.
The challenged decision permits the Montana Department of Fish, Wildlife, and
Parks ("FWP") to make at least 67 helicopter landings in the remote Scapegoat
Wilderness, apply rotenone and potassium permanganate to lakes and streams to
kill existing fish, restock the waters with hatchery-reared westslope cutthroat trout,
and use motorized and gas-powered boats and equipment to facilitate the efforts.
The Forest Service categorically excluded the project from analysis in an
Environmental Impact Statement or Environmental Assessment under the National
Environmental Policy Act.  To Plaintiffs' knowledge, the helicopter landings,
broadscale use of pesticides in lakes and free-flowing waters, and intensive
wildlife manipulations authorized by the Forest Service in this case represents one
of the most extensive intrusions on wilderness character that has ever been
authorized in the National Wilderness Preservation System.

2.      FWP states that the project's primary purpose is to establish a
population of westslope cutthroat trout in the North Fork of the Blackfoot River
watershed, upstream of a natural fish migration barrier waterfall in the Scapegoat

Wilderness.   Secondarily, it states the project would eliminate or reduce a source of hybridized fish that may mix with westslope cutthroat trout downstream of the natural fish barrier, though it admits that downstream westslope cutthroat trout are equally at risk, if not more at risk, of hybridization from fish downstream of the project area and below the waterfall.  Fish above the waterfall have existed in the area since the 1920s when hatchery stocking efforts began, but evidence indicates the area was fishless prior to stocking.  This project is one of many similar westslope cutthroat expansion projects FWP is undertaking across the state of Montana.

3.      "A wilderness, in contrast with those areas where man and his own works dominate the landscape, is … an area where the earth and its community of life are untrammeled by man" and an area "retaining its primeval character and influence… which is protected and managed so as to preserve its natural conditions…."  16 U.S.C. §1131(c).  The Wilderness Act charges the Forest Service, as federal steward of the Scapegoat Wilderness, with a duty to preserve the area's wilderness character.  *Id.* § 1133(b).  To that end, the statue prohibits the Forest Service from conducting or authorizing specific activities in wilderness areas that Congress determined are antithetical to wilderness character—including helicopter landings and motorized use—unless "necessary to meet minimum requirements for the administration of the area" as wilderness.  *Id.* §1133(c).

2

4.     The Forest Service's authorization for FWP to conduct large-scale, helicopter-assisted stream poisoning to remove previously stocked fish, followed by the stocking of westslope cutthroat trout in areas that were likely historically fishless, violates the Wilderness Act and its implementing regulations because facilitating FWP's wildlife-management objectives is not necessary to meet minimum requirements for administering the Scapegoat Wilderness as wilderness. To the contrary, FWP's wildlife-management goals are fundamentally at odds with the Wilderness Act's mandate to preserve the Scapegoat's "untrammeled" quality and "natural conditions." *Id.* § 1131(c). Even assuming that facilitating FWP's wildlife-management goals is necessary to preserve the Scapegoat as wilderness, which is not the case, the Forest Service fails to demonstrate that FWP's helicopter-assisted poisoning and stocking proposal is the minimum action necessary to achieve that objective, dismissing non-pesticide, non-motorized, and non-stocking alternatives as well as westslope cutthroat trout actions that can be taken outside of Wilderness.

5.     The Forest Service also violates the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. ("NEPA"), and its implementing regulations. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their decisions and evaluate all reasonable alternatives that would minimize adverse environmental impacts. The Forest Service violates NEPA by failing to

prepare an environmental impact statement ("EIS") fully analyzing the effects of the helicopter-assisted fish-poisoning project it authorized.  Instead, it categorically excludes FWP's proposal from full NEPA review.  The Forest Service violates NEPA by improperly applying a categorical exclusion for wildlife habitat improvement projects that do not include the use of herbicides, and by applying this categorical exclusion when there are extraordinary circumstances present, including the intensive authorization of multiple prohibited activities in a federally designated wilderness.  Further, the Forest Service fails to analyze FWP's plan to introduce bull trout into the same area, arbitrarily confining its analysis to only the westslope cutthroat portion of "the broader umbrella of the North Fork Blackfoot river native fish conservation project."  The Forest Service also violates NEPA by failing to adequately analyze impacts of rotenone poisoning and containment issues, failing to analyze a reasonable range of alternatives to FWP's proposal, and failing to analyze the cumulative effects of FWP's project combined with other reasonably foreseeable actions in the Wilderness—notably, FWP's plan to introduce bull trout in the same area in coming years.

6.     In authorizing the challenged project, the Forest Service disregards its mandatory legal duties under the Wilderness Act and NEPA.  If helicopter intrusions, motorized use, and broadscale wildlife manipulations in wilderness are permissible whenever a state agency asserts that a wildlife population is not

meeting the state's objectives, it is difficult to comprehend when a request to authorize such actions in the wilderness to advance wildlife management ever would be denied.  Similarly, if such an action does not require NEPA review in an environmental assessment or an environmental impact statement, it is difficult to comprehend when a project authorizing wilderness-degrading activities ever would require NEPA review.  Accordingly, plaintiffs seek relief from this Court.

7.     An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy the Scapegoat Wilderness for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

8.     The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, the Wilderness Act, and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 and 2202, as well as 5 U.S.C. §§ 705 and 706.

**JURISDICTION AND VENUE**

9.    Plaintiffs bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, which waives the federal defendant's sovereign immunity, *see id.* § 702.  This Court has jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

10.    Venue is proper under 28 U.S.C. § 1391(b) and (e)(1) and LR 3.2(b) because Defendant Marten has an office in Missoula County, in the Missoula Division of this Court, and Plaintiffs Wilderness Watch, Alliance for the Wild Rockies, and Flathead-Lolo-Bitterroot Citizen Task Force are also located in Missoula County, and Friends of the Wild Swan is located in Lake County, all within the Missoula Division of this Court.

**PARTIES**

11.    Plaintiff Wilderness Watch is a non-profit conservation organization whose sole mission is the preservation and proper stewardship of lands and rivers in the National Wilderness Preservation System and the National Wild and Scenic Rivers System.  To that end, since 1989 Wilderness Watch has engaged in public policy advocacy, congressional and agency oversight, public education, and litigation to promote sound stewardship of federal wilderness areas and Wild and

Scenic River corridors.  Wilderness Watch is headquartered in Missoula, Montana, and has offices in Idaho and Minnesota.

12.    Plaintiff Alliance for the Wild Rockies is a tax-exempt, non-profit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Project area in the Lolo National Forest. The Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty to protect and conserve these ecosystems as set forth below. Alliance for the Wild Rockies brings this action on its own behalf and on behalf of its adversely affected members.

13.    Plaintiff Flathead-Lolo-Bitterroot Task Force is an incorporated Montana non-profit public interest organization based in Missoula, Montana. Task Force brings this action on its own behalf and on behalf of its adversely affected members. Task Force works to protect the natural features and primitive aspects of the Northern Rockies and specifically the Flathead, Lolo and Bitterroot National

Forests, the native fish and wildlife and habitat for Threatened and Endangered Species –including the grizzly bear – for our continued use and enjoyment. Task Force educates the public on issues affecting our area of concern and participates in the development of long term plans for National Forests and grizzly bear recovery.

14.     Plaintiff Friends of the Wild Swan Inc. is a tax exempt, public-benefit Montana non-profit corporation. Its principal place of business is in Swan Lake, Lake County, Montana. Friends of the Wild Swan is dedicated to protecting and restoring water quality and fish and wildlife habitat in Montana.

15.     Plaintiff Conservation Congress is a grassroots, 501c3 nonprofit organization that advocates for the protection of native wildlife and their habitat, including aquatic species. It works to protect established wilderness and roadless areas for use by imperiled species and from further encroachment by humans. Conservation Congress is a membership organization with approximately 500 members throughout the western United States.

16.     All plaintiff groups and their staff, members, and supporters have longstanding interests in preserving the wilderness character of federally designated wilderness in the Northern Rockies region, including the Scapegoat Wilderness.  Members of each of the plaintiff groups use the Scapegoat Wilderness—including the area where FWP's proposed helicopter-assisted fish

8

poisoning and stocking project will occur—for pursuits such as hiking, camping, backpacking, snowshoeing, hunting, fishing, wildlife viewing, and enjoyment of solitude.  Members of the plaintiff groups seek out the Scapegoat Wilderness, including the North Fork of the Blackfoot River, for these activities because of its incomparably remote, quiet, and untrammeled qualities and the opportunities for exceptional solitude and reflection that it offers.  Members of the plaintiff groups also value the Scapegoat Wilderness, and the community of life it protects from intentional human manipulation, for its own sake.  Members of the plaintiff groups seek to view and study wildlife, including fish and other aquatic species, in the Scapegoat Wilderness and observe the natural interactions between these wildlife species and their environment.

17.    The legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, economic, recreational, spiritual, scientific, educational, and ecological preservation interests of the plaintiff groups and their members. These are actual, concrete injuries traceable to defendants' conduct that would be redressed by the relief requested.  Plaintiffs have no adequate remedy at law.

18.    Defendant Leanne Marten is the Regional Forester for Region One of the United States Forest Service, which encompasses the Lolo and Helena-Lewis and Clark National Forests and the Scapegoat Wilderness where FWP is authorized to conduct helicopter-assisted water poisoning and fish stocking.  Defendant

9

Marten's office is in Missoula, MT.  Defendant Marten is sued in her official

capacity.

19.     Defendant United States Forest Service is an agency of the United

States Department of Agriculture.

## LEGAL FRAMEWORK

20.     **The Wilderness Act.**  Congress enacted the Wilderness Act, 16

U.S.C. §§ 1131-1136, "to secure for the American people of present and future

generations the benefits of an enduring resource of wilderness."  16 U.S.C. §

1131(a).  To that end, the Wilderness Act provides for the establishment of a

National Wilderness Preservation System "with the explicit statutory purpose 'to

assure that an increasing population, accompanied by expanding settlement and

growing mechanization, does not occupy and modify all areas within the United

States and its possessions, leaving no lands designated for preservation and

protection in their natural condition.'" *Wilderness Soc'y v. U.S. Fish & Wildlife

Serv.*, 353 F.3d 1051, 1055 (9th Cir. 2003) (en banc) (quoting 16 U.S.C. §

1131(a)).  Congress defined "wilderness" as "an area where the earth and its

community of life are untrammeled by man" and an area "retaining its primeval

character and influence… which is protected and managed so as to preserve its

natural conditions…." *Id.* § 1131(c).  The Act's opening section "sets forth the

Act's broad mandate to protect the forests, waters, and creatures of the wilderness in their natural, untrammeled state" and "show[s] a mandate of preservation for wilderness and the essential need to keep [nonconforming uses] out of it." *Wilderness Soc'y*, 353 F.3d at 1061-62.

21.     Though the Wilderness Act recognizes recreational and conservation-related activities as appropriate uses of wilderness areas, *see id.* § 1133(b) (describing public uses of wilderness), the statute makes the mandate of wilderness preservation paramount, *see id.*, requiring that all such activities be conducted in a manner that "preserv[es] … wilderness character" and "will leave [designated wilderness areas] unimpaired for future use and enjoyment as wilderness," *id.* § 1131(a).

22.     Further, Congress expressly prohibited certain activities in federally protected wilderness areas that it determined to be antithetical to wilderness character and its preservation.  The Wilderness Act categorically prohibits any commercial enterprise or permanent road within designated wilderness.  *Id.* § 1133(c).  The Act further dictates that "there shall be no temporary road, no use of motor vehicles, motorized equipment or motorboats, no landing of aircraft, no other form of mechanical transport, and no structure or installation" within wilderness areas unless such activity is "necessary to meet minimum requirements

for the administration of the area for the purpose of [the Wilderness Act]." *Id.*

(emphasis added).

23.     Congress charged the Forest Service with preserving the wilderness

character of the area and shall so administer such area for such other purposes for

which it may have been established as also to preserve its wilderness character."

*Id.* § 1133(b).  Accordingly, the Service's regulations dictate that wilderness use

must be "consistent with the maintenance of primitive conditions," and require that

in resolving management conflicts in wilderness, "wilderness values will be

dominant" unless expressly limited by statute or regulation.  36 C.F.R. § 293.2(b),

(c); *see also* 36 C.F.R. § 293.2(a) (dictating that, in wilderness, "[n]atural

ecological succession will be allowed to operate freely to the extent feasible").

24.     To effectuate these statutory and regulatory mandates, the Service's

wilderness-management guidance states that, "[w]here there are alternatives among

management decisions, wilderness values shall dominate over all other

considerations except where limited by the Wilderness Act, subsequent legislation,

or regulations."  U.S. Forest Serv. Manual § 2320.3 (2007).  "Wildlife and fish

management programs shall be consistent with wilderness values," *id*. at

2323.32(3), and the Forest Service is directed to "[d]iscourage measures for direct

control (other than normal harvest) of wildlife and fish populations," *id*. at

2323.32(4), and "[p]rovide an environment where the forces of natural selection

and survival rather than human actions determine which and what numbers of wildlife species will exist," *id*. at 2323.31(1).

25.     While the Wilderness Act does not preempt states' traditional responsibilities to manage wildlife on federally protected wilderness lands, including the issuance of recreational hunting and fishing licenses, the exercise of state management responsibility is constrained by the Wilderness Act and the restrictions it imposes for protection of wilderness character.  16 U.S.C. § 1133(d)(7).

26.     **The National Environmental Policy Act.**  NEPA, 42 U.S.C. §§ 4321-4370h, is "our basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a).  Congress enacted NEPA "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action."  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004).

27.     To that end, NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS must describe the underlying purpose and need for the proposed action and "evaluate reasonable alternatives" to its proposed action that

would minimize adverse environmental impacts.  40 C.F.R. §§ 1502.13, 1502.14.

The EIS must also evaluate a no-action alternative and all reasonably available

measures to mitigate adverse environmental impacts.  *Id.* § 1502.14.  Through

these analytical requirements, NEPA ensures that federal agencies will "carefully

consider[] detailed information concerning significant environmental impacts" and

guarantees that such information will be available to the public so that it "may also

play a role in both the decisionmaking process and the implementation of that

decision."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349

(1989).

28.     Pursuant to NEPA's implementing regulations, to determine whether

an EIS is required, federal agencies may first prepare a less detailed environmental

assessment ("EA").   *See* 40 C.F.R. § 1501.5.  If the agency concludes that a

project may have significant impacts on the environment, it must prepare an EIS.

*Id*.

29.     An agency may rely on a "categorical exclusion" for certain minor

actions to avoid the need to prepare an EA or EIS.  40 C.F.R. § 1501.4.  These are

defined as "categories of actions that normally do not have a significant effect on

the human environment."  40 C.F.R. § 1501.4(a).  If the agency determines a

categorical exclusion covers a proposed action, it must then "evaluate the action

for extraordinary circumstances in which a normally excluded action may have a

14

significant effect" and therefore instead require the preparation of an

environmental assessment or environmental impact statement.  40 C.F.R. §

1501.4(b).  In promulgating its CEs, the Forest Service has acknowledged that CEs

should be used for "only routine actions that have no extraordinary circumstances."

57 Fed. Reg. 43,180 (Sept. 18, 1992).

## FACTUAL BACKGROUND

## I.    THE SCAPEGOAT WILDERNESS

30.    Bordered by the Bob Marshall Wilderness to the north, the Scapegoat

Wilderness is 259,756 acres and is part of the larger Bob Marshall Wilderness

Complex totaling over 1.5 million acres.  Congress designated this wilderness in

1972 after a concerted grass-roots community effort.  The Scapegoat Wilderness is

known as the first citizen-initiated wilderness in the nation.  Its spectacular

landscape is accented by massive limestone cliffs, heavy forests, and mountain

meadows, which feed the headwaters of the Dearborn River, the South Fork of the

Sun River, the Landers Fork of the Blackfoot River, and the North Fork of the

Blackfoot River.  The Scapegoat Wilderness serves as a stronghold for iconic

wilderness species such as grizzly bears, Canada lynx, and gray wolves.

## II.    FWP'S HELICOPTER-ASSISTED FISH POISONING PROJECT

31.    In July 2020, FWP released a Draft Environmental Assessment for a

proposal to poison 3 lakes and 67 miles of streams within the Scapegoat

Wilderness with rotenone to remove previously stocked fish.  Montana Fish,
Wildlife and Parks, Draft Environmental Assessment for North Fork Blackfoot
River Westslope Cutthroat Trout Conservation Project, 8 (July 2020) ("FWP EA").
The proposal then called for up to 5 years of stocking hatchery-reared westslope
cutthroat trout.  *Id*. at 11.  FWP would utilize helicopters and other motorized
equipment to facilitate its efforts.  *Id*. at 10-11.  The Draft EA, which FWP
prepared under the State's Montana Environmental Policy Act, indicated the
project's primary purpose was to "establish[] a population of westslope cutthroat
trout in the North Fork Blackfoot River watershed upstream of a barrier waterfall
in the Scapegoat Wilderness."  *Id*. at i.  And, "[s]econdarily, the project would
eliminate a source of nonnative genes that threaten native westslope cutthroat trout
… downstream of the barrier falls."  *Id*.

32.     The Scapegoat project is one of multiple fish removal and stocking
projects planned this year in Montana.  *See* Montana Fish, Wildlife and Parks,
Decision Notice for the Draft Environmental Assessment: North Fork Blackfoot
River Westslope Cutthroat Trout Conservation Project, 20 (November 2020)
("FWP Decision Notice").  FWP has opportunities outside of the Scapegoat
Wilderness for creating new populations of westslope cutthroat trout.  *See id*.

33.     FWP indicates westslope cutthroat trout declines across the state of
Montana is a primary reason for the project, and the proposal would offset losses

16

elsewhere in the state by establishing a population in protected habitat above the

barrier waterfall.  *See* FWP EA 1; FWP Decision Notice 25.  FWP considers

establishing cutthroat trout populations in historically fishless waters a

conservation priority, and FWP acknowledges a lack of evidence demonstrating

westslope cutthroat trout presence above the falls before prior stocking efforts

began.  FWP Decision Notice 10; FWP EA 4.  While FWP indicates westslope

cutthroat trout are present in neighboring watersheds, it acknowledges the waterfall

blocks upstream movement of fish in the project watershed.  *Id*.  When

commentors expressed concern over stocking fish in historically fishless waters,

FWP dismissed the concern noting that the project waters "were stocked before

wilderness designation [beginning in the 1920s] and therefore, trout are considered

indigenous to the project area" and "FWP retains the authority to change the

species stocked in favor of a native species."  FWP Decision Notice 10; *see also id*.

at 22 ("[r]egardless of the historical condition above the falls, the project area is

currently an ideal location to establish a secure conservation population of

westslope cutthroat trout.").

34.     Further, FWP acknowledges that its project is not primarily focused

on protecting westslope cutthroat trout below the falls and within the Wilderness.

"Even with the reduction or elimination of the hybrid population above the falls,

nothing will prevent further expansion of rainbow trout and hybridization from

expanding up to the falls from the downstream reaches of the river." FWP

Decision Notice 9.  One commentor noted:

> The EA states throughout that a primary goal of the venture is to reduce the threat of hybrids leaking into the lower North Fork Blackfoot and thereby increasing genetic introgression in the WSCT population that currently occurs there. However, nowhere in the EA or supporting document is there a description of the existing size, demographics and genetics of the WSCT population that currently occurs in the lower North Fork or main Blackfoot River. And thus, it's not clear if the primary threat to genetically unaltered or nominally genetically altered fish below the falls are hybrids that leak down from above the falls. After all, it appears the fish in the upper reach have been there for a long time but in low abundance. It could be that a larger threat, or at least a very significant threat, are the rainbows and rainbow cutthroat hybrids that already occur in the main Blackfoot or lower North Fork.

*Id*. at 12.  FWP responded by reiterating that the primary project objective is to

establish a new population of westslope cutthroat trout above the natural barrier

falls.  *Id*. at 13.  And it admitted:

> If the sole objective was to eliminate the source of nonnative genes above the falls, we would not be pursuing this action, because as the comment noted correctly, there is an equal (and maybe greater) risk of further invasion/spread of rainbow genetics from the lower North Fork Blackfoot and the mainstem Blackfoot River. Rainbow trout are distributed throughout the entire North Fork below the falls, with densities increasing near the confluence with the Blackfoot.

*Id*.; *see also id*. at 9.

35.    Other commentors expressed concern that FWP would be restocking

the project area with a hatchery-reared strain of westslope cutthroat trout that does

not include donor fish from the Blackfoot River.  *Id*. at 14.  FWP acknowledged

that the fish do not contain Blackfoot donor sources, but dismissed this concern

arguing the hatchery-reared fish outperformed local, wild westslope cutthroat trout.

*Id*.; FWP EA 11.

36.    Further, FWP acknowledged that its project analysis excluded details

of its broader plan to introduce bull trout to the same waters above the falls.  FWP

EA 14-15.  FWP considers the introduction of a bull trout "a desirable future

condition for the area upstream of the falls" and has indicated plans to introduce

bull trout to the project area under the broader umbrella of the North Fork

Blackfoot River fish conservation project.  *Id*.; FWP Decision Notice 20.

However, FWP plans to address bull trout introduction in a separate analysis

process in part because of concern that the "considerable consultation"

requirements involved with bull trout introduction would delay the rotenone and

westslope cutthroat component of the project.  FWP EA 14.

37.    FWP also acknowledged that its project analysis excluded impacts to

designated wilderness.  While FWP's proposal includes direct fish and aquatic

population and habitat manipulations, extensive pesticide applications to

wilderness lakes and streams, motorized uses, and helicopter landings, FWP did

not analyze project impacts to designated wilderness and wilderness character in its

EA, noting instead that a wilderness-specific analysis and NEPA requirements

would be left to the Forest Service.  FWP EA iii, 5.  Likewise, aside from a no-

action alternative, the FWP assessment did not analyze alternatives to the proposed action. *Id*. at iii.

38.     For its part, the Forest Service did not prepare an environmental assessment or an environmental impact statement for the project.  It instead filled out a minimum requirements decision guide ("MRDG") worksheet, which purported to assess the suitability of the proposed activities in designated wilderness and pursuant to the Wilderness Act.  U.S. Forest Serv, Minimum Requirements Decision Guide, North Fork Blackfoot River Indigenous Fish Restoration (undated) ("MRDG").  The MRDG incorporated by reference a "Supplement to Minimum Requirements Analysis/Decision Guide (MRA/MRDG): Evaluating Proposals for Ecological Intervention in Wilderness," which was "written to address ecological intervention proposals that commonly entail complex legal, scientific, and ethical questions that may be beyond the realm of a typical MRDG."  MRDG at 2.  The agency's MRDG worksheet is an internal document to assist the agency in assessing Wilderness Act compliance and is not intended to be a substitute for NEPA review.

39.     In the MRDG, the Forest Service notes there are no laws specifically requiring the implementation of the proposed project in wilderness, MRDG 4, but states the project is necessary in wilderness because the existing fish population above the falls consists of fish species introduced by land managers since the

1920s that have hybridized and present a risk to westslope cutthroat trout below the falls, *id*. at 5, 7. It acknowledged that westslope cutthroat trout hybridization and habitat loss is regional issue. *See* MRDG 9-10, FWP EA i. It did not acknowledge, however, that rainbow trout are already hybridizing with westslope cutthroat trout below the falls, upstream expansion of downstream rainbow trout will continue to pose a risk of westslope cutthroat trout hybridization below the falls, and westslope cutthroat trout stocking above the falls will not alleviate this issue. *See* FWP Decision Notice 9, 13. While evidence indicates the area above the falls was historically fishless prior to stocking, the Forest Service rejected full consideration of a no-stocking alternative for the instant project. MRDG 65. The Forest Service also rejected analysis of a non-motorized alternative because of the scale and complexity of the project as proposed. *Id*. Instead, the Forest Service considered three action alternatives with varying degrees of motorized use. *See* MRDG 66. All alternatives involved rotenone poisoning in 67 miles of stream and 3 lakes in the Wilderness and the restocking of fish above the falls after poisoning. *Id*. at 12-65.

40.    On January 22, 2021, the Forest Service issued a scoping letter briefly explaining the Scapegoat project proposal to the public; indicating its intent to issue a pesticide use permit under a Category 6, which categorically excludes from detailed NEPA review wildlife habitat improvement activities that do not include

the use of herbicides; and inviting public comment.  U.S. Forest Serv., Scoping

Letter, North Fork Blackfoot River Fish Restoration Project (January 2021).

41.    Wilderness Watch and other individual organizations and individuals

submitted timely public comments expressing concern about project impacts on

wilderness character, wildlife, and ecosystems, and expressing dismay that the

Forest Service would consider authorizing the project through a categorical

exclusion, particularly one that expressly precludes the use of herbicides.

Wilderness Watch, Comments on U.S. Forest Serv., Scoping Letter, North Fork

Blackfoot River Fish Restoration Project, 8 (March 2021).  In fact, several retired

Forest Service officials—including a retired Deputy Regional Forester for Region

One, a retired Regional Wilderness Program Manager, and a retired Program

Manager for Recreation—submitted comments opposing the use of a categorical

exclusion and requesting the Forest Service "do the right thing initially and prepare

an EIS."

42.    Wilderness Watch also expressed concern over rotenone impacts to

non-target species citing an incident in 2010 where another FWP westslope

cutthroat trout project inadvertently poisoned fish miles downriver from the project

area.  WW Comments 8.  The 2010 project included safeguards to prevent

rotenone escape similar to the ones in the challenged project.  To Plaintiffs'

knowledge, FWP never discovered the cause of the inadvertent rotenone

poisoning, though FWP hypothesized rotenone may have entered the groundwater system and resurfaced downstream.  *See id*.

## III.   THE CHALLENGED FOREST SERVICE AUTHORIZATION

43.   On July 15, 2021, Wilderness Watch learned from the Forest Service that it was planning to release a signed Decision Memo imminently and project activities could begin as soon as the first week of August.

44.   On July 16, 2021, the Forest Service released its Decision Memo and made it publicly available on the project webpage.  The Decision Memo was signed by Forest Supervisors Avey and Upton, respectively, on May 25, 2021 and June 2, 2021 but, it was not released to the public until July 16, 2021.

45.   The Decision Memo authorized rotenone poisoning of approximately 67 miles of stream and three lakes above a natural fish migration barrier in the Scapegoat Wilderness, re-stocking of the project area with hatchery-reared westslope cutthroat trout over the next five years, approximately 67 helicopter landings, and the use of a motorboat and motorized generators and pumps to facilitate the project.  Decision Memo 4 (authorizing the proposed action described in the MRDG).  The Forest Service in proposing this project is responding to FWP's proposal to "establish a secure conservation population of non-hybridized to slightly hybridized westslope cutthroat trout in the North Fork of the Blackfoot River in the Scapegoat Wilderness."  *Id*. at 1.  The Forest Service confined its

23

decision to "approving a Pesticide Use Proposal in wilderness for the use of rotenone in the Scapegoat Wilderness and authorization of activities normally prohibited in wilderness." *Id*. The Forest Service did not explain in the Decision Notice why FWP's poisoning and stocking project "is necessary for the administration of" the Scapegoat Wilderness, and thereby permissible under the Wilderness Act. It instead generally referenced the MRDG for Wilderness Act compliance. The Forest Service did not disclose or address FWP's bull trout introduction plan or other foreseeable activities likely to occur in the project area under the umbrella of the broader "North Fork Blackfoot River native fish conservation project." It likewise did not address Wilderness Watch's concerns about inadvertent rotenone poisoning similar to the incident in 2010.

46.    The Forest Service's decision to approve the project rests on its determination that FWP's helicopter-assisted stream poisoning and stocking project is necessary to satisfy minimum requirements for administering the Scapegoat Wilderness as wilderness, is the minimum tool necessary for achieving that purpose, and will have no significant environmental impacts.

## FIRST CAUSE OF ACTION
### (Violation of the Wilderness Act and Implementing Regulations)

47.    Plaintiffs hereby reallege and reincorporate all previous paragraphs.

48.    The Wilderness Act charges the Forest Service, as federal steward of the Scapegoat Wilderness, with a duty to preserve the area's wilderness character.

24

*Id.* § 1133(b).  The Wilderness Act defines Wilderness "in contrast with those areas where man and his own works dominate the landscape" and as "an area where the earth and its community of life are untrammeled by man," an area "retaining its primeval character and influence," and "which is protected and managed so as to preserve its natural conditions."  16 U.S.C. § 1131(c).  To further protection of wilderness character, the Wilderness Act expressly prohibits any landing of aircraft and any use of motorized equipment or motorboats within designated wilderness "except as necessary to meet minimum requirements for the administration of the area" as wilderness.  16 U.S.C. § 1133(c).

49.    The Forest Service's authorization violates the Wilderness Act and its implementing regulations because the project undermines the goals of the Wilderness Act, *see* 16 U.S.C. § 1131(c), and the prohibited activities are not "necessary to meet minimum requirements for the administration of the area" as wilderness, *see* 16 U.S.C. § 1133(c).

50.    The stated purpose of the Forest Service's decision is to "authorize a project developed by [FWP] to establish a secure conservation population of non-hybridized to slightly hybridized westslope cutthroat trout in the North Fork of the Blackfoot River in the Scapegoat Wilderness" and "approve a Pesticide Use Proposal in wilderness for the use of rotenone in the Scapegoat Wilderness and authorization of activities normally prohibited in wilderness."  Decision Memo 1.

Facilitating a state's wildlife-management decisions is not necessary to satisfy minimum requirements for administering the Scapegoat Wilderness as wilderness. While recreational fishing and conservation-related activities are permissible uses of wilderness, they are permitted only insofar as they do not impair wilderness character. *See* 16 U.S.C. §§ 1131(a), 1133(b); 36 C.F.R. § 293.2(b), (c) (dictating that human uses of wilderness allowed only insofar as such use is consistent with maintaining primitive conditions and requiring that management decisions privilege wilderness values over other considerations).

51.     FWP's wildlife-management objectives are antithetical to the preservation of wilderness character.  Poisoning historically fishless wilderness streams to remove previously stocked fish and then restocking the area with a different species of hatchery-reared fish that will outcompete wild fish is the antithesis of wilderness—"an area where the earth and its community of life are untrammeled by man" and "which is protected and managed so as to preserve its natural conditions."  16 U.S.C. § 1131(c).  The Forest Service's reasoning is inherently arbitrary, and it is inadequate to overcome the Wilderness Act's strict protective provisions.

52.     The Forest Service rests its wilderness necessity determination on the speculation that the project will prevent previously stocked fish species from spreading below the falls and diluting the genetics of downstream westslope

cutthroat trout.  MRDG 7.  Assuming *arguendo* that active and ongoing fish and wildlife manipulations, with their inherent blindspots and value biases, could produce natural conditions in wilderness, the record does not support such an intervention here.  When pressed on information about the existing size, demographics, or genetics of the westslope cutthroat trout population below the falls, FWP conceded that westslope cutthroat trout, rainbow trout, and hybridized fish are distributed below the falls.  FWP Decision Notice 13.  FWP reiterated that protecting downstream westslope cutthroat trout is not a primary purpose of the project and admitted there is "an equal (and maybe greater) risk of further invasion/spread of rainbow genetics" from the lower North Fork and mainstem of the Blackfoot River below the falls.  *Id*.  Further, the presence of ESA protected bull trout below the falls, including in the pools directly below the falls, *see* FWP Decision Notice 13, would likely preclude the downstream application of rotenone for similar purposes.  The Forest Service did not acknowledge or address these issues in its analysis.  If the Forest Service could invoke the exception from the Wilderness Act's prohibitory provisions based on unsupported speculation that an activity might improve natural conditions outside of the project area, the exception would swallow the rule.

53.    The Forest Service's implication that restocking the area above the falls with westslope cutthroat trout will improve wilderness character regardless of

27

an effect on downstream fish is similarly faulty. The record supporting the Forest

Service's decision indicates the area above the falls was historically fishless. *See*

FWP Decision Notice 10; FWP EA 4 (admitting there is no genetic evidence of

fish presence before stocking and that the falls blocks upstream movement of fish

in the project area); Decision Memo 7. The Forest Service cannot rationally rely

on the speculative wilderness benefits of species population manipulations while

dismissing the adverse impacts to wilderness character from ongoing

manipulations and the multiple prohibited uses necessary to carry out those

manipulations, including the intensive use of helicopters to poison 67 miles of

stream and three lakes.

54.    To the extent the agencies have broader conservation goals for

westslope cutthroat trout, the Forest Service's decision is also arbitrary and

capricious because similar actions can be, and are, undertaken outside of the

Scapegoat Wilderness to facilitate state-wide westslope cutthroat trout

conservation.

55.    Even assuming that facilitating FWP's fish-management plans were

necessary to preserve wilderness character, which they are not, the Forest Service's

determination that helicopter-assisted fish poisoning and stocking in the wilderness

is the minimum action necessary for achieving that objective is arbitrary and

unsupported. For example, the Forest Service irrationally rejected development

and consideration of a no-stocking alternative.  *See* MRDG 65.  It rejected

consideration of this alternative for two reasons.  First, it stated that "regardless of

a historic natural population, this alternative would alter the Natural character of

the Scapegoat Wilderness by not reestablishing a fish population due to the

presence of fish at the time of Wilderness Designation for the Scapegoat."  MRDG

65.  And, second, it stated that "[w]ithout restocking aspects of this project it is

highly unlikely that chemical treatments would accomplish the goal of suppressing

non-indigenous fish to a point that they no longer pose a threat to the healthy

downstream population of [westslope cutthroat trout]."  *Id*.  But perpetuating the

stocking of fish in naturally fishless streams is not preserving the natural character

of the Scapegoat Wilderness.  And, FWP admits that establishing a westslope

cutthroat trout population in the project area will not protect downstream

populations from hybridization.  Without fully considering a no-stocking

alternative, and without fully assessing the impacts of the stocking component of

the project on wilderness character, the Forest Service cannot credibly assert that

FWP's project as proposed is the minimum necessary to administer the Scapegoat

Wilderness.

56.    The Forest Service's challenged authorization violates the Wilderness

Act because it degrades wilderness character and because the Forest Service has

not rationally demonstrated that facilitating FWP's helicopter-assisted fish

poisoning and stocking project is the minimum necessary for administering the
Wilderness.

## SECOND CAUSE OF ACTION
**(Violation of NEPA and Implementing Regulations—Arbitrary and Unlawful Use of Categorial Exclusion and Failure to Prepare an EIS and Adequately Evaluate Impacts and Alternative)**

57.     Plaintiffs hereby reallege and reincorporate all previous paragraphs.

58.     NEPA requires federal agencies to prepare a detailed EIS before
undertaking any "major Federal actions significantly affecting the quality of the
human environment." 42 U.S.C. § 4332(2)(C).  The EIS is NEPA's core
requirement; it ensures that the agency will have available and carefully consider
detailed information on significant environmental impacts when making its
decision and guarantees that the public also will have access to this information
and a meaningful opportunity to participate in the agency's decision-making
process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

59.     In issuing a Decision Memo and categorically excluding the project
from detailed NEPA review, the Forest Service violates this requirement.  Further,
in conducting its NEPA review, the Forest Service arbitrarily disregards the actual
scope of FWP's planned action, which involves the introduction of another fish
species—bull trout—to the project area. *See* FWP Decision Notice 20 (noting the
"current EA process is limited to the westslope cutthroat trout phase of the

30

project.").  The Forest Service's arbitrary segmentation of FWP's proposal also renders the Decision Memo unlawful.

60.     The Forest Service's determination that FWP's helicopter-assisted fish poisoning and stocking activities qualify for categorical exclusion is unlawful because the selected categorical exclusion does not apply to the instant project, and even if it did, extraordinary circumstances render its application unlawful.

61.     An agency may rely on a "categorical exclusion" for certain minor actions to avoid the need to prepare an EA or EIS.  40 C.F.R. § 1501.4.  These are defined as "categories of actions that normally do not have a significant effect on the human environment."  40 C.F.R. § 1501.4(a).  If the agency determines a categorical exclusion covers a proposed action, it must then "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect" and therefore instead require the preparation of an environmental assessment or environmental impact statement.  40 C.F.R. § 1501.4(b).

62.     Here, the Forest Service relies on CE-6 which applies to "[t]imber stand and/or wildlife habitat improvement activities that do not include the use of herbicides[.]"  36 C.F.R. § 220.6(e)(6).  This categorical exclusion does not apply to the authorized action because the poisoning of fish in wilderness streams with a pesticide and restocking fish in historically fishless streams does not fit within the

category of actions contemplated by the categorical exclusion. *See id*. (providing examples of various terrestrial forest-habitat activities including girdling trees to create snags, thinning or brush control to improve growth, and prescribed burning of understory to address fire and improve growth).

63.     Additionally, even if the categorical exclusion did apply, extraordinary circumstances render its application unlawful. "Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or EIS" include "Congressional designated areas, such as wilderness," and "Federally listed threatened or endangered species or designated critical habitat" and "Forest Service sensitive species." 36 C.F.R. § 220.6(b)(1). While the mere presence of a resource condition does not preclude use of a categorical exclusion, "the degree of the potential effect of a proposed action on these resource conditions … determines whether extraordinary circumstances exist." *Id*. § 220.6(b)(2).

64.     Here, the Forest Service authorizes a "high intensity" of activities normally prohibited in wilderness to facilitate a fish population manipulation project, with speculative and uncertain impact, that fundamentally undermines the Wilderness Act's "untrammeled" mandate. Congress prohibited helicopter landings and motorized use in wilderness precisely because those activities degrade wilderness character. *See* 16 U.S.C. §§ 1131(a) (Wilderness Act enacted

to "assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas … leaving no lands designated for preservation and protection in their natural condition"), 1133(c) (prohibiting the landing of aircraft and the use of motorboats and motorized equipment).  The Forest Service also determines that the project "may affect *and is likely to adversely affect* grizzly bear," which is an ESA-listed species.  Decision Memo 5.  These are extraordinary circumstances that require thorough analysis in an EIS, or at a minimum, in an EA.

65.     In addition to arbitrarily discounting extraordinary circumstances, the Forest Service's Decision Memo rests on arbitrary segmentation of FWP's fish stocking proposal.  FWP indicates in its own project analyses that the instant project is a component of a larger "North Fork Blackfoot River native fish conservation project."  FWP EA 15; FWP Decision Notice 20 (noting the "current EA process is limited to the westslope cutthroat trout phase of [that larger] project.").  FWP segmented the projects in part because bull trout introduction "brings the need for considerable consultation [regarding an ESA-listed species]" and such consultation and additional analysis would cause delays.  FWP EA 14.  The introduction of bull trout would also implicate a "federally listed threatened or endangered species" that would further complicate the use of a categorical exclusion.  *See* 36 C.F.R. § 220.6(b)(1)(i).

66.     The Forest Service also violates NEPA by failing to analyze a reasonable range of alternatives.  NEPA requires the agency to "evaluate reasonable alternatives" to its proposed action that would minimize adverse environmental impacts.  40 C.F.R. § 1502.14(a); *see Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) ("'The existence of a viable but unexamined alternative renders an EA inadequate.'") (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004)).

67.     The Forest Service's Decision Memo violates these requirements. The Forest Service states in its Decision Memo that it "proposes to authorize a project developed by [FWP] to establish a secure conservation population of non-hybridized to slightly hybridized westslope cutthroat trout in the North Fork of the Blackfoot River in the Scapegoat Wilderness."  Decision Memo 1.  The Forest Service articulates the purpose and need for the project to preclude actions that could be taken outside of wilderness to address the State's fish management goals. Similarly, non-stocking and non-motorized alternatives are summarily excluded from consideration because they would not achieve this narrow purpose and need. As a consequence, the Forest Service fails to analyze a reasonable range of alternatives to the authorization of helicopter-assisted fish poisoning and stocking project in the Wilderness.

34

68.     Further, the Forest Service fails to properly analyze rotenone impacts to non-target species.  "NEPA requires agencies to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public." *Western Watersheds Project*, 719 F.3d at 1047 (quotation omitted).  "This 'hard look' requires a 'full and fair discussion of significant environmental impacts'" in the agency's NEPA analysis.  *Id.* "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* (quotation omitted).

69.     The Forest Service fails to satisfy this standard in analyzing the impacts of rotenone impacts on non-target species.  Wilderness Watch expressed concern over rotenone impacts to non-target species citing an incident in 2010 where another FWP westslope cutthroat trout project inadvertently poisoned fish miles downriver from the project area.  WW Comments 8.  The Forest Service fails to address this concern and adequately analyze potential impacts of inadvertent rotenone poisoning on non-target species, including ESA-protect bull trout downstream of the project area.

## PRAYER FOR RELIEF

Therefore, Plaintiffs respectfully request that this Court:

70.     Declare the Forest Service violates the Wilderness Act, NEPA, and those statutes' implementing regulations by authorization FWP's helicopter-assisted fish poisoning and stocking project in the Scapegoat Wilderness;

71.     Set aside the Forest Service's Decision Memo and associated permits authorizing FWP's helicopter-assisted fish poisoning and stocking project in the Scapegoat Wilderness;

72.     Grant temporary, preliminary, and permanent injunctive relief to prohibit the Forest Service from further implementing the challenged authorization;

73.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

74.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 22nd day of July, 2021.


/s/Dana Johnson
WILDERNESS WATCH

/s/Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC


*Attorneys for Plaintiffs*

VERIFICATION

I, George Nickas, Executive Director of Plaintiff Wilderness Watch, verify under penalty of perjury that the allegations in this Complaint are true and accurate to the best of my knowledge.

Dated this 22nd Day of July, 2021.


George Nickas

## CERTIFICATE OF SERVICE

I certify that I served a true and accurate copy of this document via email

attachment on July 22, 2021 on the following:

AUSA Mark Smith
mark.smith3@usdoj.gov

/s/Timothy M. Bechtold
Bechtold Law Firm, PLLC
Attorneys for Plaintiffs