Dear Leanne:

We are writing to you out of concern over a couple of proposals by the Montana Fish, Wildlife and Parks (FWP) to apply rotenone to kill unwanted fish species in Wilderness streams and lakes, then stock those streams and lakes with fish that are native to the geographic area.  Currently we know of proposals in the Scapegoat and Absaroka-Beartooth (A-B) Wildernesses, though there may be others that we have not heard about.  We commented on the proposal in the Scapegoat and have attached our comments for your information.  The comment period closed on the A-B project by the time we heard about it.  We  saw a recent article in the newspaper indicating FWP is proposing numerous such projects across the state in the near future.  We've looked at the list of projects, but have no way of knowing whether or not those projects fall within designated Wilderness.  We can only assume some do.

Leanne, we are writing to you, not out of concern over the projects themselves, but rather over concern for the process that is being followed by the Region to approve these projects.  We understand that the Agency has determined that the State has jurisdiction over the fish themselves and the USFS decision is to approve application of chemicals in Wilderness and the methods by which the state is accessing the Wilderness, applying the chemicals, and stocking the "native" fish.

We were quite dumbfounded to see that both the Lolo and the Gallatin are thinking that the projects can be categorically excluded (CE) from further NEPA analysis.  Not only is this illegal, but it is also unethical.  A CE limits opportunities for the public to review and comment and precludes a thorough analysis and consideration of alternatives and mitigation.

We understand that Wilderness by itself is not an extraordinary circumstance.  If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding the use of the CE.

*"In considering extraordinary circumstances, the responsible official should determine whether or not any of the listed resources are present, and if so, the degree of the potential effects on the listed resources.  If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion.*

*If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA. If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS."*
*(36 CFR 220.6(c))*

The fact is, based on the degree of effects, these proposed actions WILL have a significant environmental effect.  There will be significant affect to the untrammeled and solitude qualities of wilderness character, at the very least.  Therefore, an EIS is called for.  A CE is certainly not appropriate.  Please recall that a project very similar to this was completed on the South Fork of the Flathead, in the Bob Marshall Wilderness.  It was authorized after an EIS was completed.

Please take a moment to read our attached comments on the Scapegoat project.  They will clearly explain why a CE is not sufficient for projects of this magnitude and responds to the specific process that is currently being considered for authorization of these projects.  To go down the CE road will not only result in law suits, that the USFS is likely to lose, but is a slippery slope that we certainly hope the region does not endorse.

This region has always been recognized as the national leader in Wilderness management.  We are so disheartened that these shenanigans are playing out here.  In the past, we operated on the philosophy that CEs for wilderness work were the exception.  It was rare when a CE was used if the project included use of motorized equipment or mechanical transport.  And certainly never for application of chemicals.  The Wilderness Act has not changed, nor have the regs regarding the legal use of a categorical exclusion.  So, why is it now acceptable to even consider a CE for these projects?

We would appreciate a response from you, with an explanation as to why the forests think they can use CEs to authorize this work in Wilderness.

Thank you for your time.

Sincerely,

Kathy McAllister, Deputy Regional Forester, Northern Region, Retired, kmcallister@bigsky.net
Deb Gale, Recreation and Wilderness Program Leader, Bitterroot NF, Retired, galemt1@cybernet.com
Chris Ryan, Wilderness Program Manager, Northern Region, Retired, mcryan2010@gmail.com
Kimberly Schlenker, Recreation and Wilderness Program Leader, Custer and Gallatin NF, Retired, schlenker)1@msn.com
Kari Gunderson, PhD, Wilderness Management Professor and Mission Mountains Wilderness Ranger, Retired, cnd2543@msn.com

EXHIBIT 6

John Slown, Environmental Coordinator
North Fork Blackfoot Fish Restoration Project

Dear Mr. Slown:

Thank you for the opportunity to comment on the proposed project to remove hybrid trout from the NF of the Blackfoot River and restock with Westslope Cutthroat Trout. This project falls nearly entirely with the Scapegoat Wilderness.

First, we'd like to state our confusion over the use of a Categorical Exclusion for this project. From your scoping letter you indicate that the CE is used to authorize the issuance of the Pesticide Use Permit (PUP). The category that you cite is (6) "Wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction." Is the intent of this category to authorize the use of pesticides? That is certainly not obvious by the example of the types of projects to be authorized under that category:

*(i) Girdling trees to create snags;*
*(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;*
*(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and*

*(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.*

*(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;*
*(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and*
*(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.*
*(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;*
*(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and*
*(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.*

It sure seems to us that using this category to approve a PUP is a stretch. Please explain how you have determined that this project falls under that category.

Secondly, we are confused about what type of analysis you plan on completing to authorize the myriad of prohibited activities that are planned to complete this project.

From the Minimum Requirements Analysis we ascertained that the project includes:

  Helicopters for transport of materials

  Motorboats in Parker Lake to disperse the chemicals

◆  Landing of Aircraft—45 flights initially as well as additional flights in subsequent years.



-  Installation of a temporary radio repeater
-  Pesticide application
- Habitat alteration-temporary beaver dam breaching and path clearing (no specific description provided)

These actions in Wilderness cannot be authorized with a categorical exclusion, if that's what you were thinking.  Certainly you know that Wilderness is an extraordinary circumstance.

### 31.2 - Extraordinary Circumstances

*Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:*
*(1) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;*
*(2) Flood plains, wetlands, or municipal watersheds;*
*(3) Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas;*
*(4) Inventoried roadless areas or potential wilderness areas;*
*(5) Research natural areas;*
*(6) American Indians and Alaska Native religious or cultural sites, and*
*(7) Archaeological sites, or historic properties or areas.*
*The mere presence of one or more of these resource conditions does not preclude use of a categorical exclusion (CE).  It is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determine whether extraordinary circumstances exist.  (36 CFR 220.6(b))*

In considering extraordinary circumstances, the responsible official should determine whether or not any of the listed resources are present, and if so, the degree of the potential effects on the listed resources.  If the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion.

*If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA.  If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.*
*(36 CFR 220.6(c))*

The fact is, these proposed actions WILL have a significant environmental effect.  There will be significant affect to the untrammeled and solitude qualities of wilderness character, at the very least.  Therefore, an EIS is called for, certainly not a CE.  Please recall that a project very similar to this was completed on the SF of the Flathead.  It was authorized after an EIS was completed.

In case you are thinking that the Minimum Requirements Decision Analysis replaces a NEPA document, it does not. One of us was instrumental in the original development of that MRDG document. It was NEVER intended to replace NEPA. In fact, it was intended to inform the appropriate NEPA document by helping to establish the purpose and need for the project and give a resource specialist a jump off point for alternative development. To jump straight to a CE is suspicious that it was intended to rush the project and reduce the public's opportunity to comment.

The EA completed by the FWP does not analyze the affects of the project to Wilderness so can certainly not replace a thorough FS analysis.

Oddly, the MRDG left out any reference to Forest Service Wilderness Policy found in FSM 2320. Pertinent sections include authorities for approving the project that is being suggested.

### 2323.04b - Chief

The Chief is responsible for approving:

1. Vegetative cover manipulation.

2. Fish and wildlife habitat manipulation.

### 2323.04c - Regional Forester

Unless specifically reserved to the President (FSM 2323.04a) or the Chief (FSM 2323.04b) or assigned to the Forest Supervisor (FSM 2323.04d) or the District Ranger (FSM 2323.04e), the Regional Forester is responsible for approving all measures that implement FSM direction on the use of other resources in wilderness. Specific responsibilities include but are not limited to:

1. Requiring visitor registration and/or permits to measure visitor use.

2. Approving construction of trails with tread more than 24 inches in width.

3. Approving seeding methods other than broadcast seeding, except as provided in FSM 2323.04b.

4. Developing, with the involved State(s), a supplement to the State/Forest Service memorandum of understanding, which will establish fish and wildlife management coordination in wilderness. The joint Forest Service and International Association of Fish and Wildlife Agencies Guidelines will be used to develop compatible management activities (FSH 2309.19).

5. Approving fish control projects.

6. Approving control measures for predators or problem fish and wildlife species.

7. Approving debris clearing on spawning streams for anadromous species.

      8. Approving the practice of dropping fish from aircraft, if deemed necessary, in cases where such practice was established before the area became part of the National Wilderness Preservation System.

      9. Approving the use of pesticides within wilderness.

      10. Approving activities for gathering information about resources.

      11. Approving emergency burned area rehabilitation projects.

      12. Stabilizing or restoring and subsequently maintaining structures with cultural resources values.

## 2323.34f - Chemical Treatment

Chemical treatment may be used to prepare waters for reestablishment of indigenous, threatened or endangered, or native species, or to correct undesirable conditions caused by human influence. The Regional Forester approves all proposed uses of chemicals in wilderness (FSM 2150).

We strongly suggest you just do the right thing initially and prepare an EIS. To try and authorize this project with a CE will likely result in delays brought on by law suits and will serve as a huge black eye for the Northern Region which has always been thought of as a leader in Wilderness management.

Sincerely,

Kathy McAllister, Deputy Regional Forest, retired (and author of the McAllister memo, you dumshits)
Chris Ryan, Regional Wilderness Program Manager, retired
Deb Gale, Program manager for Recreation, Wilderness and Trails, Bitterroot National Forest, retired
Dr. Kari Gunderson, Professor of Wilderness Management and the only one of us still working!